

# In the Missouri Court of Appeals
# Eastern District

### DIVISION FOUR

| | | |
|---|---|---|
| ZACHARIAH FOLTZ, | ) | No. ED111086 |
| | ) | |
| Appellant, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| v. | ) | Cause No. 2022-CC00574 |
| | ) | |
| CITY OF ST. LOUIS, et al., | ) | Honorable Christopher McGraugh |
| | ) | |
| Respondents. | ) | Filed: September 5, 2023 |

### Introduction

Officer Zachariah Foltz appeals from the circuit court's judgment affirming the Civil Service Commission's decision terminating his employment with the St. Louis Metropolitan Police Department. Officer Foltz challenges the manner in which he was terminated, arguing the Department failed to provide him an Employee Misconduct Report ("EMR") prior to his pre-termination hearing, which is mandated by the Department's Police Manual. Further, Officer Foltz claims he was dismissed unlawfully for refusing to follow an order in violation of his Fifth Amendment right against self-incrimination and the Department's Police Manual. Finally, Officer Foltz argues that any other violations of the Department's Police Manual were insufficient to warrant his termination.

This Court finds Officer Foltz was provided due process in the termination proceeding. But, the Department improperly forced Officer Foltz to choose between his employment and his Fifth Amendment rights in violation of *Garrity v. New Jersey*, 385 U.S. 493 (1967) and *Gardner*

*v. Broderick,* 392 U.S. 273 (1968). Accordingly, this Court reverses and remands for the Commission to reconsider its decision in light of this opinion.

**Background**

On August 4, 2018, investigators at the Department's Internal Affairs Division ("IAD") interviewed the parents of a twelve-year-old girl who alleged their child had a sexual relationship with Officer SK.[1] According to the child's diary, she had a sexual encounter with Officer SK when he picked her up in his patrol car. As a result of these allegations, the Department instigated two investigations, one internal, led by IAD, and one criminal. Based upon the Department's policy, these investigations remained on separate but parallel tracks. Information from the criminal investigation could be shared with the internal investigator, but information from the internal investigation could not be shared with the criminal investigator.

The Department sought to interview Officer Foltz as a witness in the internal investigation because he was in the patrol car with Officer SK and the child. Officer Foltz came to IAD's interview with his counsel. Before the interview, IAD's commanding officer, Lieutenant WB, informed Officer Foltz's counsel that Officer Foltz was not the subject of the investigation but was a potential witness in the internal and criminal investigations of Officer SK. During this conversation, Officer Foltz's counsel expressed concern about what the circuit attorney—who had the ultimate authority to decide whether to charge someone with a crime—might do with any statements Officer Foltz made in the criminal investigation. Officer Foltz and his counsel had only limited information on the allegations at the time because Officer Foltz was the first witness IAD interviewed after talking with the complainants.

---

[1] The City of St. Louis's motion to supplement the record on appeal, to which Officer Foltz consents, is granted. All names of witnesses have been omitted in accordance with Section 509.520, RSMo Supp. 2023.

Officer Foltz's interview began with both an internal investigator and a criminal investigator in the interview room. Counsel was present during the entire interview, which was recorded on video and audio. The internal investigator confirmed that Officer Foltz had been given an Advice of Rights form, which informed Officer Foltz:

> [Y]ou are being questioned as part of an official investigation of the Police Department. You will be asked questions related and specifically directed to the performance of your official duties or fitness for office. You are entitled to all of the rights and privileges guaranteed by the laws and the Constitution of this State and the Constitution of the United States, including the right not to be compelled to incriminate yourself …. [I]f you refuse to testify or to answer questions relating to the performance of your official duties or fitness for duty, you will be subject to departmental charges which could result in your dismissal from the Police Department. If you do answer, these statements may be used against you in relation to subsequent departmental charges, but not in any subsequent criminal proceedings against you.

Both Officer Foltz and the internal investigator signed the form, which contained a handwritten IAD file number. IAD calls this form a "*Garrity* warning" and calls statements made to an internal investigator pursuant to this warning "*Garrity* statements," referring to *Garrity v. New Jersey*. Officer Foltz confirmed that his counsel explained the Advice of Rights form to him, he understood it, and he had no questions.

The internal investigator began to read Officer Foltz his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), which is typical at the outset of an interview in a criminal investigation. The criminal investigator interrupted and explained there was no need to read Officer Foltz his *Miranda* rights because Officer Foltz was not going to make any statements in the criminal investigation. The criminal investigator asked whether Officer Foltz understood that declining to make a statement in the criminal investigation could result in discipline. Officer Foltz said he understood, but did not want to make a statement to the criminal investigator. The criminal investigator left the room.

The internal investigator then questioned Officer Foltz regarding the allegations of "inappropriate acts" between Officer SK and the child that was in their patrol car the day before. Officer Foltz answered all of the internal investigator's questions. At the conclusion of the internal investigator's questioning, the internal investigator conferred with Lieutenant WB.

Lieutenant WB told the internal investigator to return to the interview room with the criminal investigator and order Officer Foltz to make a statement to the criminal investigator. Both investigators followed Lieutenant WB's directions and relayed the order. Officer Foltz conferred privately with his counsel and again declined to make a statement in the criminal investigation.

After Officer Foltz refused to give a statement to the criminal investigator, Lieutenant WB ordered he be transferred from the patrol division to the communications division. Because Officer Foltz would no longer be on patrol, another officer immediately went to take possession of Officer Foltz's patrol car and discovered that Officer Foltz had left that car running with the keys in the ignition and the doors locked for the entire three hours he was being interviewed.

Subsequently, IAD interviewed Officer Foltz regarding his running patrol car. Officer Foltz also sent Lieutenant WB an email accusing Lieutenant WB of attempting to push him out of the department because he would not "lick your boot" and sabotaging his attempts to get another job. IAD also interviewed Officer Foltz about the email. Officer Foltz admitted the email was disrespectful, but stated he was frustrated that at the initial interview regarding Officer SK's conduct, Lieutenant WB gave an order directly violating his rights and continued to subject him to discipline. Officer Foltz stated he did not believe he had to follow an incorrect order of a superior officer.

The internal investigator prepared an Administrative Reports Transmittal Sheet ("ARTS"), which summarized the investigation, recommended discipline, and was signed by Lieutenant WB.

The ARTS detailed five allegations of misconduct against Officer Foltz that arose or were discovered during the internal investigation. The ARTS found: (1) Officer Foltz refused to provide a witness statement to the criminal investigator voluntarily; (2) Officer Foltz refused to provide a witness statement to the criminal investigator after being ordered to do so by his superior; (3) Officer Foltz violated the Department's special orders by leaving his patrol car running and unattended for over three hours; (4) Officer Foltz and Officer SK violated the Department's special orders by moving their patrol car more than one block without advising the dispatcher; and (5) Officer Foltz sent a disrespectful email to Lieutenant WB in violation of the Police Manual. The ARTS recommended Officer Foltz be terminated.

On April 1, 2019, a document titled "Notice of Recommended Termination and Pre-Termination Review" was hand-delivered to Officer Foltz. A copy of the ARTS was attached to the notice, along with a two-page document stating that "dismissal was being considered for the following reasons" and setting out each of the five grounds delineated in the ARTS. The notice specified that the first two grounds—refusing to cooperate and failing to obey an order—were each independent and separate grounds for termination. The notice provided a time and date for the pre-termination review at IAD. The notice explained that, before the review, Officer Foltz was allowed to "review the evidence against" him and, at the review, he would be allowed to "respond to the charge(s), and/or present any mitigating factors or circumstances." Officer Foltz signed the notice.

On April 4, 2019, Officer Foltz and his attorney attended the review at IAD. Officer Foltz confirmed he received a copy of the ARTS. The allegations therein were read aloud, after which Officer Foltz submitted a detailed written response to each allegation. Officer Foltz did not deny the allegations regarding leaving the patrol car running, moving the car without notifying dispatch,

5

or sending the insubordinate email, but he argued that none of those violations independently constituted grounds for termination. The hearing concluded.

Major MS terminated Officer Foltz later that day based on the allegations set forth in the ARTS. Major MS stated Officer Foltz's failure to cooperate in the criminal investigation violated the Code of Ethics, was contrary to the Department's purpose of investigating crime and holding people accountable for criminal acts, and suggested to the public that the police department holds its officers to different standards than other citizens. Major MS also determined that Lieutenant WB ordering Officer Foltz to provide a criminal statement was reasonable because Officer Foltz had "disclosed no wrongdoing" during his interview with the internal investigator and there was "no reason for [Officer Foltz] not to give a statement against another police officer." He also agreed, however, that at the outset of the interview regarding Officer SK's conduct, Officer Foltz exercised his Fifth Amendment privilege not to speak to the criminal investigator.

Officer Foltz appealed his termination to the Civil Service Commission. Following a hearing, the Commission affirmed his termination. The Commission found Officer Foltz's testimony was not credible, but the Department's witnesses were credible. The Commission determined Officer Foltz never specifically asserted his Fifth Amendment right. It further concluded Lieutenant WB's order, compelling Officer Foltz to provide a statement to the criminal investigator was reasonable and should have been followed. Officer Foltz admitted to the other allegations of misconduct in the ARTS. The Commission found that, "under the totality of the circumstances," the termination was proper. Officer Foltz sought judicial review in the circuit court.

The circuit court reviewed the record and entered its judgment, affirming the Commission's decision. This appeal follows.

**Standard of Review**

In a contested case appeal, this Court reviews the agency decision and not the circuit court's judgment. *Ferry v. Bd. of Educ. of Jefferson City Pub. Sch. Dist.*, 641 S.W.3d 203, 206 (Mo. banc 2022). Under Article V, section 18 of the Missouri Constitution, this Court determines whether the agency decision is "authorized by law" and "supported by competent and substantial evidence upon the whole record."

The appellate court reviewing the agency's factual findings "must consider all of the evidence that was before the agency and all of the reasonable inferences that may be drawn from that evidence, including the evidence and inferences that the agency rejected in making its findings." *Seck v. Mo. Dep't of Transp.*, 434 S.W.3d 74, 79 (Mo. banc 2014). This Court defers to the agency's credibility determinations and its determination of the weight given to conflicting evidence. *Ferry*, 641 S.W.3d at 206. This Court also defers to the agency's factual findings provided "there is sufficient competent and substantial evidence in the record to support them and they are not contrary to the overwhelming weight of the evidence." *Id*. at 206-07 (internal quotation marks and citations omitted).

However, this Court conducts *de novo* review on questions of law. Section 536.140.3, RSMo 2016.[2]

*Due Process*

Officer Foltz argues that the Department terminated him without due process because he never was notified in writing of the charges or allegations leading up to his termination prior to the pre-termination hearing. Primarily, Officer Foltz argues that he was not provided written notice prior to his pre-termination hearing or given a copy of the EMR.

---

[2] All statutory references are to RSMo 2016, unless otherwise indicated.

Officer Foltz has a constitutionally protected property interest in his continued employment. Section 84.600; *Belton v. Bd. of Police Com'rs of Kansas City*, 708 S.W.2d 131, 137 (Mo. banc 1986). Accordingly, due process requires he receive "notice and an opportunity to respond." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985). Officer Foltz was "entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id*. This notice should be sufficiently detailed to allow the employee to protect himself from an unfair disciplinary action. *Schwartz v. City of St. Louis*, 274 S.W.3d 509, 512 (Mo. App. 2008).

In accordance with these due process considerations, the Department's policy provides for a pre-termination review prior to a dismissal. This process commences with advising the employee of pending charges, including an explanation and evidence for those charges. The notice also requires the time and date for the review, informs the employee that there is a right to be represented, and lists consequences for failure to appear. The employee may review the evidence and is provided an opportunity to present mitigating facts.

Officer Foltz received, and acknowledged the receipt of, the charges against him three business days prior to the pre-termination hearing. Officer Foltz claims the Department was required to prepare an EMR, but that a copy of this report was not provided to him. Officer Foltz states the lack of the EMR deprived him of notice of all of the charges against him.

Yet, at the pre-termination review, Officer Foltz was represented by counsel and presented a detailed six-page response, responding to the Department's notice of the charges against him. Officer Foltz was fully apprised of the evidence against him. Officer Foltz was given the opportunity to defend himself against those allegations and did so at the pre-termination hearing. This notice and review fully complied with due process standards. *See Brown v. City of St. Louis*,

8

561 S.W.3d 839, 846 (Mo. App. 2018) (finding no due process violation where the employee was hand-delivered a pre-termination letter three days prior to the hearing informing him of the essential elements of the charges against him, he appeared at the hearing with a union representative, and he had the chance to refute the charges against him). Officer Foltz's due process rights were not violated.

*Assertion of the Fifth Amendment*

Officer Foltz also argues that his termination was unlawful because it violated his Fifth Amendment right against self-incrimination. Officer Foltz states he clearly invoked his right against self-incrimination and that right was violated when he was ordered to give a second statement in the criminal investigation without adequate assurances that the statement would not be used in a criminal prosecution against him. Officer Foltz asserts this violated the protections afforded him by *Garrity*.

At the time of his interview, Officer Foltz was faced with limited information about the circumstances surrounding the pending investigation, other than generally knowing that a minor child made allegations of sexual contact with Officer SK and he was in the patrol car with them on the date of the allegations. Officer Foltz provided a statement in the internal investigation. Officer Foltz declined to make a statement to the criminal investigator.[3] Officer Foltz again declined to make a statement in the criminal investigation even after Lieutenant WB ordered him to do so. The issue before this Court is whether Officer Foltz's refusal to provide a statement in

---

[3] The criminal investigator testified during the Commission's hearing that, had Officer Foltz provided a statement to the criminal investigator, Officer Foltz would have been issued *Miranda* warnings. Further, had Officer Foltz said something that "incriminated him in a criminal act," he "would have been arrested."

the separate criminal investigation, without the same *Garrity* assurance, was an invocation of his Fifth Amendment rights and whether he could be terminated for that refusal.

The Fifth Amendment provides simply that "[n]o person …. shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.[4] "The Amendment not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceeding." *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973). Public employees do not lose their Constitutional rights, including the privilege against self-incrimination, merely by nature of their employment by a public entity. *Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation of City of New York*, 392 U.S. 280, 284–85 (1968).

Some tension arises, however, between a public employee's privilege against self-incrimination and the public employer's need to investigate issues involving the performance of the employee's job. The U.S. Supreme Court addressed this tension in *Garrity v. New Jersey*, 385 U.S. at 497. In *Garrity*, several police officers came under investigation regarding the alleged fixing of tickets. *Id.* at 494. Before being questioned, the officers were told they could assert their right to remain silent, but if they did so, they would be subject to termination. *Id.* The officers answered the questions, and those answers were used over the officers' objection in a subsequent criminal prosecution. *Id.* at 495. The officers appealed the convictions, arguing that their

---

[4] The Fifth Amendment has been made applicable to the states by the Fourteenth Amendment. "The Fourteenth Amendment secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement—the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty … for such silence." *Malloy v. Hogan*, 378 U.S. 1, 8 (1964).

statements should not have been used because they were effectively coerced by the threat of the loss of their jobs. *Id.*

The Supreme Court agreed, holding the "protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic." *Id.* at 500. In other words, the government cannot "use the threat of discharge to secure incriminatory evidence against" a public employee because to do so "is the antithesis of free choice to speak out or to remain silent." *Id*. at 497, 499. The threat of termination is sufficiently coercive so as to render the resulting statements involuntary. *Id*. at 497-98. The Court, therefore, reversed the convictions of the officers because the Constitution prohibited the use of their coerced statements in a subsequent criminal proceeding against the officers. *Id*. at 500.

The Court extended *Garrity*'s holding in *Gardner v. Broderick*, to prevent the termination of a police officer when the officer has refused to waive his right against self-incrimination. 392 U.S. 273, 274 (1968). In *Gardner*, a police officer appeared under subpoena to testify before a grand jury investigating alleged bribery and corruption in his police department. *Id*. The officer was advised of his rights against self-incrimination, asked to sign a waiver of immunity, and told he would be fired if he did not sign. *Id*. at 274. The officer refused to waive his rights and was terminated. *Id.* at 275. He sued for reinstatement and back pay, arguing that his termination was unlawful. *Id.* at 274.

In holding that the officer should be reinstated, the Court found the officer was presented with an impermissible choice of waiving his constitutional right against self-incrimination or losing his job, and he could not be terminated "solely for his refusal to waive the immunity to

which he is entitled if he is required to testify despite his constitutional privilege." *Id*. at 277-78. The Court noted that it did not matter whether the waiver of immunity the officer was asked to sign would ultimately have been effective in light of the immunity provided by *Garrity* because "the mandate of the great privilege against self-incrimination does not tolerate the attempt, regardless of its ultimate effectiveness, to coerce a waiver of the immunity it confers on penalty of the loss of employment." *Id.* at 279. It was improper to fire the officer for refusing to sign a document even "purporting to waive his constitutional rights" because he was not required to assume that doing so would have been "an idle act of no legal effect." *Id*.

"No ritualistic formula or talismanic phrase is essential in order to invoke the privilege against self-incrimination." *State v. Rice*, 573 S.W.3d 53, 67 (Mo. banc 2019) (quoting *Emspak v. United States*, 349 U.S. 190, 194 (1955)). An individual only must "give a clear, consistent expression of a desire to remain silent." *Id.* (internal quotation marks and citations omitted). Refusing to answer questions indicates "a clear desire to remain silent" and thus invokes one's Fifth Amendment rights. *State v. Ellmaker*, 611 S.W.3d 320, 333 (Mo. App. 2020) (abrogated on other grounds by *State v. Shepherd*, 643 S.W.3d 346 (Mo. banc 2022)); *State v. Lingle*, 140 S.W.3d 178, 185 (Mo. App.2004).

It is undisputed Officer Foltz refused to speak to the criminal investigator. Even though this refusal was not accompanied by any oral invocation of the Fifth Amendment, it was, as a matter of law, an invocation of his right to remain silent and not make potentially self-incriminating statements. Further, even upon terminating Officer Foltz, Major MS recognized Officer Foltz exercised his Fifth Amendment privilege not to speak to the criminal investigator. Accordingly, the Commission's finding that Officer Foltz did not specifically invoke the Fifth Amendment—a

legal conclusion that we review *de novo*—is not supported by competent and substantial evidence and is incorrect as a matter of law. *See Rice*, 573 S.W.3d at 66; *Ferry*, 641 S.W.3d at 206.

However, the City insists that Officer Foltz knew he was protected by *Garrity* for both the interview by the internal investigator and the criminal investigator and that neither statement would be used against him in a subsequent criminal proceeding. The City states it did not fire Officer Foltz for refusing to a give an incriminating statement "without *Garrity* immunity." The record of the circumstances surrounding the interviews demonstrates otherwise.

The Advice of Rights form provided to Officer Foltz clearly advised that his statement to the *internal affairs investigator* could not be used against him. Officer Foltz was not given that same assurance as to any statement he made to the *criminal investigator*. The fact there were two investigations—proceeding on parallel tracks with a firewall between them, separating the flow of information from the internal to the criminal—indicates that statements made to one investigator were of a different character and would be used for different purposes than those made to the other investigator.

By the Department's policy, "*Garrity* statements" made in an internal investigation are protected by immunity and cannot be shared with any criminal investigation. This implies that statements made in a criminal investigation do not automatically have the same protections because the criminal investigator testified that, prior to a criminal investigation interview, the *Miranda* warnings are provided. There would be no reason to provide the *Miranda* warnings if the common understanding was that the statements Officer Foltz made would be provided *Garrity* immunity. Further, if Officer Foltz's statements to the criminal investigator were protected by *Garrity*, the criminal investigator would not state he would arrest Officer Foltz if incriminating

13

statements were made during the interview. The criminal investigator would not be able to arrest Officer Foltz if his statements in the criminal investigation were to be protected by *Garrity*.

Officer Foltz was not required to assume that the order to give a second statement was an "idle act of no legal effect" and would be protected under *Garrity*. *Gardner*, 392 U.S. at 279. In the absence of explicit assurances that he would be entitled to immunity for the second statement, Officer Foltz was free to assume that no immunity would attach. Moreover, the record demonstrates that Officer Foltz's counsel made Lieutenant WB aware of Officer Foltz's concern that anything he said in the criminal investigation could be used against him in a subsequent criminal prosecution. Lieutenant WB did nothing to assure Officer Foltz that his statements would be protected. This was the functional equivalent of ordering him to waive the rights he just asserted or lose his job. Lieutenant WB's order put Officer Foltz in exactly the dilemma *Gardner* forbids.[5]

Officer Foltz's termination was based, in part, on allegations that he refused to obey a valid, binding order of a superior officer and he failed to cooperate in the pursuit of justice. However, Officer Foltz invoked his Fifth Amendment right to be free from self-incrimination. His termination based upon his refusal to provide a statement in the criminal investigation violated his constitutional rights and is unauthorized by law.[6] Accordingly, the Commission erred in upholding his termination on this basis.

---

[5] The City also argued in its brief that Officer Foltz could not assert his right against self-incrimination because he was "just a witness" and because he did not say anything incriminating in his first statement. We find no support for this argument. The U.S. Supreme Court has made clear that the privilege against self-incrimination "protects the innocent as well as the guilty." *Ohio v. Reiner*, 532 U.S. 17, 18 (2001).

[6] In the future, this situation likely can be avoided by ensuring that the Advice of Rights form provided to an officer being interviewed applies to the criminal investigation as well. Moreover, nothing in *Garrity* prohibits the use of Officer Foltz's internal investigation interview in a criminal prosecution against Officer SK.

*Other Grounds for Termination*

Officer Foltz argues that the remaining three grounds for termination—leaving his patrol car running, failing to notify dispatch of a location change, and sending an insubordinate email— were insufficient to warrant immediate termination. The Commission did not consider whether the remaining three grounds, on their own or in combination, warranted immediate termination. Its decision was made on "the totality of the circumstances[.]"

Having concluded that two of the three grounds for termination were unlawful, it is unclear whether the remaining circumstances are sufficient to support Officer Foltz's termination. Therefore, we remand for consideration of the appropriate sanction for the three remaining grounds unrelated to Officer Foltz's refusal to give a statement to the criminal investigator. *See* section 536.140.5.

**Conclusion**

This Court reverses the circuit court's judgment and remands this case with directions to order the Commission to reconsider its decision in light of this opinion.

_____
John P. Torbitzky, J.

Thomas C. Clark II, P.J., and
James M. Dowd, J., concur.